UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 08-61664-CIV-Martinez-Brown


TELTECH SYSTEMS, INC.,
WONDERLAND RENTALS,
INC., AND MEIR COHEN,

        Plaintiffs,

v.

BILL MCCOLLUM, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE STATE OF FLORIDA;
MICHAEL J. SATZ, IN HIS OFFICIAL
CAPACITY AS STATE ATTORNEY
FOR THE 17TH JUDICIAL CIRCUIT IN
BROWARD COUNTY, FLORIDA; AND
THE STATE OF FLORIDA,

        Defendants.

_____/

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

This is a very simple case. It is about the right to lie. The State of Florida has passed a

statute—the Caller ID Anti-Spoofing Act—that purports to make it a crime for anyone in the

world to alter or "spoof" the caller ID—*i.e.*, to "lie" about who they are—when they place a

telephone call to or from Florida. The Act also makes it a crime for telecommunications service

providers such as Plaintiff TelTech Systems, Inc. to provide Caller ID spoofing services on their

users' calls to or from Florida.

The State of Florida cannot gainsay that it could not constitutionally enact a blanket

prohibition on lying in face-to-face situations, or in print, or verbally in a telephone conversion,

nor could it make it a crime for a printer to print false business cards or for a telephone company

to carry telephone calls in which a caller tells lies. It has no more power to enact a statute prohibiting a phone caller from lying about his identity through the manipulation of a string of numbers sent between telephones and computers, and making it a crime for a service provider to provide the technology that enables such lies.

Florida's Anti-Spoofing Act is an unconstitutional infringement on a variety of rights guaranteed by the United States Constitution to Plaintiffs and many other individuals and businesses both within and wholly outside of Florida. Most importantly, the Act imposes unconstitutional content-based restrictions on their right to communicate and will produce a chilling effect on protected expression. In addition, the Act conflicts with and is preempted by federal law. Finally, the Act violates the Interstate Commerce Clause by imposing unjustifiable burdens on a wide swath of interstate commerce, including substantial amounts of commerce occurring wholly outside of Florida.

## THE APPLICABLE STANDARD FOR SUMMARY JUDGMENT

To prevail on a summary judgment motion in this circuit, Plaintiffs must establish that the pleadings, depositions, and discovery on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A factual dispute alone does not defeat summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material only if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Because, as explained more fully below, there is no genuine issue as to any material fact in this case, Plaintiffs are entitled to judgment as a matter of law.

## ARGUMENT

I.     **The Anti-Spoofing Act Violates the First Amendment**

    A.     **The Act's constitutionality is measured under the strict scrutiny test**

The Anti-Spoofing Act adds the following prohibition to the Florida Criminal Code:

> (2) A person may not enter or cause to be entered false information into a telephone caller identification system with the intent to deceive, defraud, or mislead the recipient of a call.

> (3) A person may not place a call knowing that false information was entered into the telephone caller identification system with the intent to deceive, defraud, or mislead the recipient of the call.

Fla. Stat. §817.487 (2009).

Defendants maintain, and for purposes of this motion the Court must assume, that on a telephone call the Caller ID string is akin to the identity of the caller.[1] Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction ("*Defendants' PI Response*"), at 2 (March 2, 2009). The Supreme Court has held that identity "is no different from other components of [a] document's contents that the author is free to include or exclude," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995). Thus, the Act's prohibition on providing "false information" regarding Caller ID constitutes a content-based restriction on speech. *See Reno v. ACLU (ACLU II)*, 521 U.S. 844 (1997); *R.A.V. v. St. Paul*, 505 U.S. 377, 382, 391

---

[1] The Caller ID displayed to a called party is derived from either the Automatic Number Identification ("ANI") string or the Calling Party Number ("CPN") string in the Signaling System 7 ("SS7") system used by the public switched telephone network ("PSTN"). Neither ANI nor CPN was originally intended as a mechanism for a called party to use to identify callers. ANI was developed in the pre-SS7 (multifrequency) signaling environment to identify the billing telephone number of the calling party. The service was originally used by local exchange carriers and long distance carriers (IXCs) to identify telephone numbers for billing purposes, but was subsequently made available to customers who subscribe to 800 and 900 services. *See In The Matter Of Rules And Policies Regarding Calling Number Identification Service-Caller ID*, 9 F.C.C.R. 1764, 1766 and n. 6 (1994). ANI identifies the North American Numbering Plan telephone directory number that is associated with the billing account for a call and, for Wireline E911 systems, identifies the calling party and may be used as a call back number. *See* 47 C.F.R. §§ 9.3, 20.3. The CPN string was similarly intended to identify a landline telephone number to which a call was being billed or from which a call originated. *See In The Matter Of Rules And Policies Regarding Calling Number Identification Service-Caller ID*, 10 F.C.C.R. 11700, 11702-3 and nn. 5-6 (1995).

(1992); *ACLU of Georgia v. Miller*, 977 F. Supp. 1228 (N.D. Ga. 1997).

Such content-based restrictions are presumptively invalid and are subject to strict

scrutiny by the courts. They can be upheld only when they are justified by compelling

governmental interests and are "narrowly tailored" to effectuate those interests. *See Sable*

*Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989) (applying strict scrutiny

to invalidate indecency ban on telephone communications, and holding that government may

effectuate even a compelling interest only "by narrowly drawn regulations designed to serve

those interests without unnecessarily interfering with First Amendment freedoms"); *Fabulous*

*Assocs., Inc. v. Pennsylvania Public Utility Comm'n*, 896 F.2d 780, 788 (3d Cir. 1990)

(applying strict scrutiny to strike down "harmful to minors" restrictions in telephone

communications because of unconstitutional burden on adult rights); *ACLU of Georgia*, 977 F.

Supp. at 1232 (applying strict scrutiny to strike down a law that prohibited internet

communications that falsely identified sender despite a compelling state interest because law

was not narrowly tailored).[2]

### B.    The Act Prohibits Constitutionally Protected Speech

The Act on its face criminalizes a wide range of personal and commercial speech that is

perfectly legal when conducted face to face, in written correspondence, over the Internet, or even

over the telephone system (at least as long as no use of Caller ID is involved). Each of the

legislative staff reports on the Act identified specific legitimate uses of caller ID spoofing that

---

[2] Strict scrutiny is the appropriate test even if this is viewed in part as a commercial speech case. Laws that prevent or burden adults from providing or accessing protected speech have been subject to strict scrutiny even when the speech involves a commercial transaction. *Sable*, 492 U.S. at 115; *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964); *Fabulous Associates*, 896 F.2d at 780.

would be criminalized by the Act.[3] In addition, the Plaintiffs have identified other legitimate and

societally beneficial uses for caller ID spoofing.[4] All of these constitute protected speech, and all

are criminal violations under the Act.

There is no question that the Anti-Spoofing Act was deliberately designed to sweep

innocent, protected speech within its scope. The Defendants have now confirmed this fact:

> It is undisputed that there are both innocuous as well as nefarious uses for
> such a technology. Weighing the societal value of the innocuous uses
> against the myriad nefarious uses, the State of Florida determined that use
> of such techniques should be prohibited, with some limited exceptions.

Defendants' PI Response at 1.

Notwithstanding the claim in their *PI Response* about "weighing the societal value" of

various Caller ID uses, Defendants cannot point to any legislative findings that can justify the

disparate treatment of identical speech in the caller ID context on one hand and in every other

context on the other hand.[5]

### C.     The Act is Overbroad and Not Narrowly Tailored

The First Amendment overbreadth doctrine is based on the recognition that "the very

existence of some broadly written laws has the potential to chill the expressive activity of others

---

[3] *See* Criminal Justice Committee Staff Report on SB-694, at 3 (Fla. 2008); Committee on Homeland Security and Public Safety Staff Report on HB-225, at 2 (Fla. 2008); Policy and Budget Council Staff Report on HB-225, at 2 (Fla. 2008). The staff reports can be found at http://www.flsenate.gov/Session/index.cfm?Mode=Bills&Submenu=1&BI_Mode=ViewBillInfo&Billnum=0225&Year=2008.

[4] Among these legitimate personal and commercial uses of Caller ID spoofing are: (i) improving call center and customer service organizational responses through "mystery calling" (Cohen Aff. ¶¶ 13(b), 15-16; Leach Aff. ¶¶ 3-4); (ii) telecommuters and distributed call center workers who do not want their number to appear in the caller ID readout (Cohen Aff. ¶¶ 13(d), 16; Leach Aff. ¶ 3); (iii) doctors, magazine reporters, celebrities and people who must use home phones or personal cell phones but do not want the people they call to view their personal number (Cohen Aff. ¶ 13(d)); and (iv) persons trying to protect their privacy or anonymity for any number of other reasons (*Id.*, ¶ 13(e)). (All "Aff." references are to the affidavits attached to the Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction (Oct. 16, 2008).)

[5] A specific example of the type of activity criminalized by the Act but not made illegal in a face-to-face or any other context is discussed at pp. 6-7 of the Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("Plaintiffs' PI Memorandum") (Oct. 16, 2008).

not before the Court." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992). Under the overbreadth doctrine, a statute that affects First Amendment rights is unconstitutional if it prohibits more protected speech or activity than is necessary to achieve a compelling government interest. Under this doctrine, a law must be struck down as facially invalid if it would "'penalize a substantial amount of speech that is constitutionally protected' . . . even if some applications would be 'constitutionally unobjectionable.'" *ACLU v. Reno (ACLU I)*, 929 F. Supp. 824, 867 (E.D. Pa. 1996) (Dalzell, J.) (quoting *Forsyth County,* 505 U.S. at 129-30).

Defendants have *admitted* that the Act was deliberately designed to "penalize a substantial amount of speech that is constitutionally protected." In addition, Defendants cannot demonstrate that its restrictions promote a "compelling state interest." Neither the text of the Act nor the sparse legislative history identifies any compelling state interest that is promoted by the Act. None of the staff reports identifies any compelling interest,[6] nor did Defendants identify any such interest in their *PI Response*.

Even if there were a compelling state interest, the Act is not in any way narrowly tailored. On its face, the Act prohibits a wide variety of protected speech. *See* Point I.B, *supra*. Furthermore, because the Act is a criminal statute, it poses a very strong risk that it "may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *ACLU II* , 521 U.S. at 872; *see also Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1977); *Smith v. California*, 361 U.S. 147, 151 (1959); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). Plaintiffs have demonstrated the existence of a chilling effect in this case. *See* Cohen Aff. ¶¶ 19-31; Leach Aff. ¶¶ 11-15. As a result, the "breadth of this content-based restriction of

---

[6] See Criminal Justice Committee Staff Report on SB-694 at 1-6; Committee on Homeland Security and Public Safety Staff Report on HB-225 at 1-4; Policy and Budget Council Staff Report on HB-225 at 2-4.

speech imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective . . . ." *ACLU II*, 521 U.S. at 879. There is no way that Defendants can meet this heavy burden here.  Had the Florida legislature simply exercised more care in the drafting process, it could have easily have narrowed the scope of the prohibited conduct[7] or carved out exceptions for protected speech.

The Act is unconstitutionally overbroad precisely because it "sweeps protected activity within its proscription." *M.S. News Co. v. Casado*, 721 F.2d 1281, 1287 (10th Cir. 1983) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975)). Even under the guise of preventing fraud, the State may not justify the complete suppression of constitutionally protected speech because to do so would "'burn[] the house to roast the pig.'" *ACLU II, 521 U.S. at 882* (quoting *Sable*, 492 U.S. at 127); *see also Butler v. Michigan*, 352 U.S. 380, 383 (1957).

The failure to narrowly tailor the proscribed conduct is compounded here by the extraordinarily broad jurisdictional scope of the Act. The Act provides no exception for out of state callers or service providers who are unable to prevent their communications from reaching called parties located in Florida. By forcing these innocent parties to choose between ensuring they are not liable to prosecution in Florida and exercising their right to use caller ID spoofing at all anywhere in the world, the Act in an additional way "sweeps too broadly." *Forsyth County,* 505 U.S. at 130.

---

7 In fact, had the legislature limited the scope of the Act to intrastate telephone calls and omitted the words bracketed below, Plaintiffs would likely not be seeking relief before this Court today:

(2) A person may not enter or cause to be entered false information into a telephone caller identification system with the intent to [deceive,] defraud[, or mislead] the recipient of a call.

(3) A person may not place a call knowing that false information was entered into the telephone caller identification system with the intent to [deceive,] defraud[, or mislead] the recipient of the call.

**D.      The Act Unconstitutionally Infringes the Right to Anonymous Speech**

The Supreme Court has repeatedly upheld the right to anonymous speech under the First and Fourth Amendments. *Buckley v. American Constitutional Law Found. Inc.*, 525 U.S. 182, 197-200 (1999); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *Talley v. California* 362 U.S. 60 (1960). The right to engage in anonymous speech, particularly anonymous political or religious speech, is "an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. at 342. Anonymity "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *Id.* at 357 (striking down Ohio statute prohibiting anonymous distribution of campaign literature); s*ee also Lamont v. Postmaster General* 381 U.S. 301, 307 (1965); *Talley,* 362 U.S. at 64-65; *ACLU of Georgia v. Miller*, 977 F. Supp. 1228 (N.D. Ga. 1997) (striking down Georgia statute that made it a crime for Internet users to "falsely identify" themselves online); *Jaynes v. Commonwealth of Virginia,* 666 S.E.2d 303 (Va. 2008), *cert. denied* __ U.S. ___, 129 S. Ct. 1670 (2009) (striking down Virginia anti-spam law and reversing conviction for sending emails with false information in the email header).

The Supreme Court has characterized regulations prohibiting such anonymous speech as "a direct regulation of the content of speech." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. at 345. Like the IP address and domain name of an email sender (*see Jaynes v. Commonwealth,* 666 S.E.2d at 312-313), the identity of persons to whom phone numbers are registered can be found through searchable databases and registration documents. Thus, transmission of accurate identification data "necessarily results in a surrender of [the speaker's] anonymity." *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150, 166 (2002). By prohibiting false caller

ID information, the Act infringes on the protected right of anonymity. Both email addresses and phone numbers are the electronic equivalent of a written registration record on file in the mayor's office identifying persons who chose to canvass private neighborhoods, which the Supreme Court has held infringes the First Amendment right to anonymous speech. *Id.* at 166.

Forced identification of anonymous callers would create a chilling effect on the speech of the persons whose identity is or might be revealed. Indeed, just last year, in the course of striking down Virginia's anti-spam statute, that state's Supreme Court re-emphasized the importance of anonymous speech in our modern society finding  the statute "unconstitutionally overbroad on its face because it prohibits the anonymous transmission of all unsolicited bulk e-mails including those containing political, religious or other speech protected by the First Amendment . . . ." . *Jaynes v. Commonwealth,* 666 S.E.2d at 314. To illustrate the statute's overbreadth, the court noted that, "were the *Federalist Papers* just being published today via e-mail, the transmission by Publius would violate the statute." *Id.* This example is just as applicable here. Accordingly, the Anti-Spoofing Act, like the Virginia anti-spam statute, is unconstitutionally overbroad on its face because it prohibits anonymous speech.[8]

**II.       The Act is Preempted by Federal Law** The Anti-Spoofing Act is also invalid because it is preempted by federal law. Preemption exists here because: (1) there is outright or actual conflict between federal and state law; (2) the Act will have the practical effect of regulating commerce occurring wholly outside Florida's borders; and (3) the Act violates the

_____

[8] The Act is also void for vagueness because it affords prosecutors and law enforcement personnel far too much latitude for selective prosecution of persons who express minority viewpoints, or of small, innovative service providers who inadvertently violate the Act while offering spoofing services legal elsewhere in the U.S. The Court can be sure that Florida law enforcement authorities will not be prosecuting the incumbent providers of communications services like Verizon, BellSouth and AT&T Wireless. Rather, they will be targeting smaller providers and users such as Plaintiffs. Indeed, the Act's legislative history specifically and repeatedly refers to the SpoofCard and other spoofing services offered by Plaintiff TelTech. *See* Criminal Justice Committee Staff Report on SB-694 at 3, nn. 12-13.

9

Interstate Commerce Clause because it imposes burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970)*; see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-369 (1986) (summarizing case law governing preemption).

A.    **The Act conflicts with federal law and regulations**

      1.    **The Act conflicts with the Communications Act's jurisdictional provisions**

The language of the Act conflicts with federal law and FCC regulations in several areas. The clearest conflict arises from the fact that the Act applies to all calls where either the called or calling party is located in Florida. In other words, the Act by its terms regulates not only intrastate calls, but also interstate calls. *It is beyond dispute that the state of Florida has no jurisdiction to regulate interstate communications, including voice telephone calls.* Instead, the Federal Communications Commission ("FCC") has the sole authority to regulate "interstate and foreign commerce in wire and radio communication." 47 U.S.C. § 151 ("Communications Act"). The Communications Act's provisions and the FCC's jurisdiction "apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received in the United States . . . ." 47 U.S.C. § 152(b). The FCC has repeatedly recognized that it has the sole authority to regulate interstate communications services. *See, e.g., Vonage Holdings Corp.,* 19 F.C.C.R. 22404, 22412, ¶ 16 (2004) ("*Vonage Order*") (stating that the FCC has "exclusive jurisdiction over 'all interstate and foreign communication'"); *Mobile Telecommunications Technologies Corp.,* 6 F.C.C.R. 1938, 1941, n.6 (1991) ("The Act grants this Commission exclusive authority to regulate the charges and services of interstate common carriers."). The federal courts have consistently confirmed that only the FCC has the authority to regulate services that are interstate in nature, or

that have mixed interstate and intrastate components. *See, e.g., Louisiana Pub. Serv. Comm'n,* 476 U.S. at 369; *California v. FCC,* 567 F.2d 84 (D.C. Cir. 1977) (*per curiam*), *cert. denied,* 434 U.S. 1010 (1978); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 700 (1983) (finding that FCC regulations preempted local standards); *see also City of New York v. FCC,* 486 U.S. 57, 63-64 (1988) (same); *National Ass'n of Regulatory Utility Commr's v. FCC,* 746 F.2d 1492, 1498 (D.C. Cir. 1984) (interstate communications are "totally entrusted to the FCC"); *California v. FCC,* 39 F.3d 919, 931-933 (9th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1427, 131 L.Ed.2d 309 (1995).

The Act's prohibitions apply to voice telephone calls originating or terminating on all interstate networks—not just landline networks, but also wireless networks and the Internet. The Act limits—and thus regulates—both the nature of information that can be entered on devices on those networks and the nature of information that can be transmitted to or over the interstate SS7 network. This constitutes a clear conflict with the explicit language of Sections 151 and 152(b) of the Communications Act.

### 2.       The Act conflicts with FCC rulings and federal case law

In addition to conflicting with the explicit language of the Communications Act, the Anti-Spoofing Act also conflicts with applicable FCC regulations in several areas.[9] The first involves the specific part of the telephone system at issue here—caller ID and the use of data in the SS7 system. The FCC has for at least 15 years preempted state jurisdiction over Caller ID. In 1994 and 1995, the FCC's *Caller ID Orders* set forth a comprehensive framework

---

[9] Preemption may result not only from action taken by Congress but also from federal agency action that is within the scope of the agency's congressionally delegated authority. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 369 (citing *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141 (1982)); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. at 691.

governing the rights and obligations of telecommunications carriers to provide and use SS7 caller ID data.[10] At that time, the FCC pre-empted inconsistent state regulations.[11] In doing so, it noted that "preemption of state regulations is necessary in some instances to ensure that our goal of facilitating the development of interstate calling party number based services is not frustrated by inconsistent state law, and that state decisions with respect to caller ID or other calling party number based services do not infringe upon the privacy interests of parties in other states." 9 F.C.C.R. at 1775.

The logic that led the FCC to recognize in the *Caller ID Orders* that state caller ID regulations must not frustrate the paramount federal interest in a cohesive interstate communications system applies with full force in this case. There is no service in which the interstate and intrastate components are more intermingled than the call signaling or SS7 system used on the public switched network ("PSTN") throughout the U.S. It is impossible to separate SS7 (or its caller ID data fields) into interstate and intrastate components for purposes of enabling incompatible federal and state regulations to coexist without negating federal policy and rules. *See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369.

The Act also conflicts with FCC decisions on regulation of the Internet, and particularly those on regulation of voice over Internet protocol ("VOIP") services.[12] The FCC has a

---

[10] *See In re Rules and Policies Regarding Calling Number Identification Service-Caller ID,* 9 F.C.C.R. 1764 (1994); *In re Rules and Policies Regarding Calling Number Identification Service-Caller ID,* 10 F.C.C.R. 11700 (1995).

[11] See *In re Rules And Policies Regarding Calling Number Identification Service-Caller ID,* 9 F.C.C.R. at ¶¶ 69-71; and 10 F.C.C.R. at 11700.

[12] " . . . VoIP service may be 'nomadic' or 'fixed.' Nomadic service allows a customer to use the service by connecting to the Internet wherever a broadband connection is available, making the geographic originating point difficult or impossible to determine. Fixed VoIP service, however, originates from a fixed geographic location." *Vonage Holdings Corp. v. Nebraska Public Serv. Comm'n*, No. 08-1764, ___ F. 3d ___, 2009 WL 1161584, at *1 (8th Cir. May 1, 2009) ("*Vonage Holdings Corp. v. Nebraska PSC*").

"longstanding policy of non-regulation of information services," which include VOIP and other applications originating on computers on the Internet. *See* 47 U.S.C. §§ 157nt and 230(b); *Vonage Order* at ¶¶ 14, 21, n. 77. Indeed, the FCC has repeatedly concluded that Internet services are "the type of commerce that is of such a 'unique nature' that it 'demand[s] cohesive national treatment' under the Commerce Clause." *See*, *e.g.*, *Vonage Order* at ¶ 41. Numerous courts have acknowledged the need for uniform national treatment for Internet-based services. *See*, *e.g.*, *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 169 (S.D.N.Y. 1997); *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999).

The Eighth Circuit affirmed the *Vonage Order* in *Minnesota PUC v. FCC,* 483 F.3d 570 (8th Cir. 2007), holding that "any state regulation of an information service [such as VOIP] conflicts with the federal policy of non-regulation." *Id.* at 580.  Earlier this month, the Eighth Circuit reaffirmed that holding in Nebraska's challenge to a district court injunction that prevented the state from requiring Vonage to collect a state universal service fee from customers with billing addresses in Nebraska:

> In Minn. Pub. Utils. Comm'n, we interpreted the Vonage ... [O]rder, holding: 'The impossibility exception, if applicable, is dispositive of . . . whether the FCC has authority to preempt state regulation of VoIP services.' 483 F.3d at 578. We concluded, as did the FCC, that VoIP services cannot be separated into interstate and intrastate usage. Id. at 578-79. We find nothing in the NPSC's arguments here to alter our earlier conclusion. Because Vonage's nomadic interconnected VoIP service cannot be separated into interstate and intrastate usage, the impossibility exception is determinative.
>
> The impossibility exception further requires a finding the state regulation interferes with valid federal rules or policies. The NPSC argues the NUSF does not interfere with the USF because it only applies to the percentage of usage not encompassed within the FCC's safe harbor provision, i.e., 35.1 percent. Thus, according to the NPSC, the NUSF is consonant with federal regulations.
>
> *       *       *

A reasonable interpretation of this language [in the *Vonage Order*] is the FCC has determined, given the impossibility of distinguishing between interstate and intrastate nomadic interconnected VoIP usage, it must have sole regulatory control. Thus, while a universal service fund surcharge could be assessed for intrastate VoIP services, the FCC has made clear it, and not state commissions, has the responsibility to decide if such regulations will be applied.

*Vonage Holdings Corp. v. Nebraska PSC*, 2009 WL 1161584, at 4.

Similarly, the *Vonage Order* preempts the type of state regulation embodied in the Anti-Spoofing Act. It is up to the FCC, not the state of Florida, to decide what type of information can or cannot be entered by callers using VOIP to make calls to or from Florida. [13]

For all these reasons, the Anti-Spoofing Act is invalid because it conflicts with federal law.

**B.    The Act regulates commerce occurring entirely outside of Florida**

The Anti-Spoofing Act is pre-empted under the Commerce Clause because it will have "the 'practical effect' of regulating commerce occurring wholly outside [Florida]'s borders." *Healy v. Beer Institute*, 491 U.S. 324, 332 (1989). Given the increased use of VOIP and mobile phones and the now common use of call forwarding, neither a service provider nor a user of

---

[13] The prohibitions of the Act conflict with FCC regulations in at least one other area. The FCC's E911 rules require VOIP providers, mobile carriers and other service providers who assign their subscribers numbers that are not part of the North American Numbering Plan to insert a false ANI or "pseudo-ANI" for purposes of using the Wireline E911 network. Pseudo-ANI is "a number, consisting of the same number of digits as ANI, that is not a North American Numbering Plan telephone directory number and may be used in place of an ANI to convey special meaning. The special meaning assigned to the pseudo-ANI is determined by agreements, as necessary, between the system originating the call, intermediate systems handling and routing the call, and the destination system." *See* 47 C.F.R. §§ 9.3, 20.3. A carrier providing pseudo-ANI strips the regular caller ID information transmitted by its network and provides different data to other networks and public safety answering points ("PSAPs") about the identity and location of a device being used by a caller who may need emergency assistance. In doing so on Florida calls, the carrier would be violating the Act. "False information" is defined in the Anti-Spoofing Act as "data that misrepresents the identity of the caller to the recipient of a call *or to the network itself*" . . . Section 817.847 (1)(d) (emphasis added). This definition creates potential liability for many telecommunications carriers serving Florida. In generating and transmitting a pseudo-ANI, a carrier is certainly not "acting solely as an intermediary for the transmission of telephone service," and the substitution of pseudo-ANI is done without the permission of the subscriber to whom the number and device belong. The plain language of the Act prohibits this conduct despite the fact that it is required by the FCC.

Caller ID spoofing can ever be certain where the party it is calling is located. As Plaintiffs have demonstrated, it is impossible in most cases to be certain that the party being called is *not* located in Florida. See Cohen Aff. ¶¶ 21-29.

The problem is magnified by the fact that there is no technology available that can permit a service provider to block all telephone calls to or from a state or a particular geographic area. It is possible to block calls to or from specific area codes, including those in which the numbers generally correspond to geographic locations in Florida. *Id.*, ¶30. However, any attempt to block such calls would be over-inclusive (because it would include calls made by or to mobile users and nomadic VOIP subscribers with Florida area code numbers but who are actually located outside of Florida) and under-inclusive (because it would not block calls made by or to mobile users or nomadic VOIP subscribers with non-U.S. numbers or non-Florida area code numbers but who are actually located in Florida when the calls are made). *Id.* Therefore, blocking calls to "Florida" area codes or blocking the use of Caller ID spoofing on calls to "Florida" area codes cannot ensure that no calls to or from Florida use Caller ID spoofing services. *Id.* Moreover, the blocking would prevent users in other states from using services that are legal in those states.

Since there is no way to be certain about a called party's location, and blocking spoofing on calls to certain area codes does not prevent spoofing on calls to or from Florida, no user or service provider offering Caller ID spoofing services anywhere in the world can ensure that it will not be in inadvertent violation of the Act. The only way that any service provider or user can ensure that it will never be in violation of the Act is to stop providing or using Caller ID spoofing *anywhere in the world*. Therefore, any entity wishing to be absolutely sure that it is not in violation of the Act will have to cease offering or using spoofing services on all calls. The vast majority of the calls on which spoofing will then be unavailable will occur wholly

outside of Florida. *See American Libraries Ass'n v. Pataki*, 969 F. Supp. at 173-74, 177;

*American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003).

The situation, then, is analogous to that in the *Vonage Order*, where the FCC cited the

effect on out-of-state commerce and the impossibility of full compliance as a crucial factor

requiring federal preemption:

> Minnesota's regulation likely has 'the "practical effect" of regulating
> commerce occurring wholly outside that [s]tate's borders.' Because the
> location of Vonage's users cannot practically be determined, Vonage
> would likely be required to comply with Minnesota's regulation for all use
> of DigitalVoice—including communications that do not originate or
> terminate in Minnesota, or even involve facilities or equipment in
> Minnesota—in order to ensure that it could fully comply with the
> regulations for services in Minnesota. And, as we have explained above,
> this would likely be the result even if Vonage elected to discontinue
> seeking subscribers in Minnesota, given that end users could use the
> service from any broadband connection in Minnesota. While states can
> and should serve as laboratories for different regulatory approaches, we
> have here a very different situation because of the nature of the service—
> our federal system does not allow the strictest regulatory predilections of a
> single state to crowd out the policies of all others for a service that
> unavoidably reaches all of them. For these reasons, Minnesota's regulation
> would likely have the "practical effect" of regulating beyond its borders
> and therefore would likely violate the Commerce Clause."

*Vonage Order* at ¶39 [footnotes omitted]; *see also Healy v. Beer Institute*, 491 U.S. at 332.

The Eighth Circuit recognized the same rationale earlier this month in its decision in

*Vonage Holdings Corp. v. Nebraska PSC*:

> Additionally, the NPSC's arguments fail to address the conflict which
> would arise if states adopted conflicting methods or proxies for
> determining which VoIP customers are subject to their respective
> universal service fund surcharges. As noted, a customer's billing address
> need not correspond to the area code affixed to the customer's telephone
> number. For example, a customer with a Nebraska billing address may be
> issued a telephone number with a Missouri area code. Under the NUSF,
> 35.1 percent of the customer's nomadic interconnected VoIP usage will be
> subject to a surcharge because Nebraska has chosen billing address as a
> proxy for where the usage occurred. Assume Missouri also adopts a
> universal service fund surcharge but chooses area code as its proxy for

> where usage occurs. The customer will be subject to duplicative
> surcharges in Nebraska and Missouri. This potential for conflict between
> state regulations militates in favor of finding preemption.

2009 WL 1161584, at 4.

The logic that led the FCC and the Eighth Circuit repeatedly to preempt state regulation of VOIP services applies with even more force in this case. The FCC and the Eighth Circuit were dealing with civil regulation of VOIP. The consequences were, at worst, economic. Here, the state has made the prohibited conduct a crime. If the "potential for conflict between state regulations militates in favor of finding preemption" in the civil regulatory context, then it must mandate preemption in this case, where the state is potentially imposing criminal liability on a worldwide basis.

### C.      The Act is preempted under the dormant Commerce Clause doctrine

The Interstate Commerce Clause has long been understood "to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) (citations omitted); *see also, PSINet, Inc. v. Chapman*, 362 F.3d 227, 239 (4th Cir. 2004) (dormant Commerce Clause prohibits state regulation that "'discriminates against or unduly burdens interstate commerce and thereby imped[es] free private trade in the national marketplace.'")(quoting *General Motors Corp. v. Tracey*, 519 U.S. 278, 287 (1997)); *American Libraries Ass'n v. Pataki*, 969 F. Supp. at 173 (holding that the Internet is an instrument of "interstate commerce" under the Commerce Clause).

This "negative aspect" is referred to as the "dormant Commerce Clause," and the Supreme Court has established a two-part inquiry for determining whether a state statute violates the dormant Commerce Clause. *Pike v. Bruce Church*, 397 U.S. at 137. The first part of the

inquiry is whether "the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental[.]" *Id.* at 142. Plaintiffs do not challenge the evenhandedness of the Anti-Spoofing Act's regulation of interstate commerce, so this Court need only consider the second part of the inquiry, a balancing test to determine whether "the burden imposed on such [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id.*

The onus is on Defendants not only to identify any such "putative local benefits," but also to prove that such benefits will be created by the Act and are not already obtainable under Florida's existing fraud and other criminal statutes. Under the *Pike* test, the Court must then weigh these alleged local benefits against the burdens imposed by the Act on interstate commerce. 397 U.S. at 142.

The Act's legislative history does not, and the Defendants cannot, identify any specific "putative local benefits" that the Act is intended to create. On the other hand, the unchallenged evidence demonstrates a wide variety of substantial burdens on interstate commerce, both within and wholly outside Florida. The most important such burden, of course, is the effect on interstate commerce in ideas and speech—the stifling of First Amendment freedoms that will occur in 49 other states if users and service providers are forced to engage in self-censorship and to continue to do so until the Act is amended or revoked. *See* Point II.B, *supra*. The Act will also impose a substantial and well-documented commercial burden on Plaintiffs and other out-of-state users and service providers. Out-of-state service providers such as Plaintiff TelTech stand to lose hundreds of thousands, if not millions of dollars—even if they attempt to comply with the Act. Cohen Aff. ¶ 31. Certain caller ID spoofing users such as Plaintiff Wonderland may be forced out of business entirely. Leach Aff. ¶¶ 14-15. Others not before the Court will

have to make similar choices about self-censorship and dropping lines of business—businesses that in some cases are conducted wholly outside of Florida—in order to ensure that they do not inadvertently violate the Act.

In any weighing by the Court of the absence of putative local benefits against the indisputably significant burdens imposed by the Act on interstate commerce, only one conclusion is possible: "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits," and the Act is preempted because it conflicts with the dormant Commerce Clause.

## CONCLUSION

Plaintiffs have shown that the Anti-Spoofing Act imposes content-based restrictions that are not narrowly tailored to achieve any purported compelling interest that the state may identify. Furthermore, they have shown that the statute is overbroad and void for vagueness, and that it is preempted by federal law and under the Interstate Commerce Clause.

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment and hold that the Caller ID Anti-Spoofing Act is unconstitutional and invalid because it is preempted by federal law.

Respectfully submitted this 11th day of May, 2009.

GRAYROBINSON, P.A.
**Attorneys for Plaintiffs**
401 East Las Olas Boulevard, Suite 1850
Fort Lauderdale, Florida  33301
Telephone : 954-761-8111
Facsimile:  954-761-8112
Email :  dalter@gray-robinson.com
Email :  gresnick@gray-robinson.com
Email :  frullan@gray-robinson.com

By: s/ Gary Resnick
GARY I. RESNICK

19

Florida Bar No. 54419
DANIEL ALTER
Florida Bar No. 033510
FRANK L. RULLAN
Florida Bar No. 150592

Mark C. Del Bianco
Co-Counsel for Plaintiffs
Law Office of Mark C. Del Bianco
3929 Washington Street
Kensington, Maryland
D.C. Bar No. 3424246
Telephone: (301) 933-7216
Email: mark@markdelbianco.com

Professor Jonathan Askin
Director, Brooklyn Law Incubator & Policy Clinic
Brooklyn Law School
One Boerum Place, Room 331
Brooklyn, NY 11201
NY Attorney Registration No. 2473437
Of Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed on this 11th day of May, 2009 with the Clerk of the Court using CM/ECF. We also certify that the foregoing document is being served on all Defendants via transmission of Notices of Electronic Filing generated by CM/ECF.